# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| CONNIE RESHARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 87-2794 (RBW) |
| | ) | |
| RAY H. LAHOOD, SECRETARY, | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF TRANSPORTATION,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____

## MEMORANDUM OPINION[2]

Connie Reshard, a member of the Pennsylvania Bar who is proceeding <u>pro se</u> in this matter, brought this action against the Secretary of Transportation in his official capacity, seeking to recover compensatory damages and injunctive relief for the defendant's alleged racial discrimination and retaliation against her in violation of 42 U.S.C. § 2000e-2000e(17) (2006) during her employment at the Department of Transportation.[3] Complaint ("Compl.") ¶¶ 7-81. Currently before the Court are the parties' cross-motions for summary judgment pursuant to

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Ray H. Lahood, the current Secretary of the United States Department of Transportation, has been substituted for the original named defendant.

[2] The amount of time it has taken to resolve this case is regrettable. However, the undersigned judge has done all that he could to resolve this case as soon as possible after being assigned to the case.

[3] The complaint asserts seven individual claims of discrimination, however, with the exception of the sixth claim of the complaint, all claims were either dismissed with prejudice or summary judgment was granted in favor of the defendant by the Judge Penn's August 8, 2000 Memorandum Opinion. See Memorandum Order (Aug. 24, 2000) at 23. Therefore, the plaintiff's sole remaining claim alleges retaliation resulting from the plaintiff "complaining . . . and later filing a formal complaint of racial discrimination." Compl. ¶ 53. For the purposes of this Memorandum Opinion, the Court will construe the plaintiff's retaliation allegations as also asserting a claim based upon additional allegations she asserts in a supplemental pleading filed on January 13, 1988, which alleges events that occurred after the termination of her employment. <u>See generally</u> Supplemental Pleading for Declaratory and Injunctive Relief.

Federal Rule of Civil Procedure 56 concerning the plaintiff's claim for retaliation,[4] see generally

Defendant's Renewed Motion for Summary Judgment; Plaintiff's Motion for Summary

Judgment Reprisals and Retaliation ("Pl.'s Mot."), as well as the defendant's motion to stay

discovery, Defendant's Motion to Stay Discovery ("Def.'s Mot. to Stay").  After careful

consideration of the parties' pleadings, motions and oppositions, and all memoranda of law and

exhibits submitted with these filings and incorporated in the motions,[5] the Court concludes the

defendant is entitled to both a stay of discovery and summary judgment on the plaintiff's sole

surviving claim.

## I.  BACKGROUND

### A.    Factual Background

The pro se plaintiff, Connie Reshard, is a graduate of the Georgetown University Law

---

[4]    As noted, the plaintiff's retaliation claim is the sole remaining claim in this action.  In a previous decision disposing of her additional claims based on the plaintiff's failure to exhaust her administrative remedies that was issued by a former member of this Court, the Court reserved its determination on whether her retaliation claim could be maintained due to its inability to discern which of the many alleged facts in the complaint related to her retaliation claim.  See Memorandum Opinion (Apr. 7, 2003).  Although the parties have made many submissions since the Court instructed them to clarify and distill the issues, the burden to clarify her claim justifiably falls mainly to the plaintiff given that she has initiated this action.  However, despite the Court's urging, clarification and precision are still lacking, and therefore to the extent necessary to resolve her sole remaining retaliation claim, the Court has assumed the responsibility of distilling from the plaintiff's complaint and the exhibits submitted by both parties only those facts and evidence that have any logical relationship to her retaliation claim.

[5]    The Court considered the following documents in rendering its decision: Defendant's Renewed Motion for Summary Judgment; Memorandum of Points and Authorities in Support of Defendant's Renewed Motion for Summary Judgment ("Def.'s Mem."); Defendant's Statement of Material Facts as to Which There is No Genuine Issue; Plaintiff's Motion for Summary Judgment Reprisals and Retaliation ("Pl.'s Mot."); Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Opp'n"); Defendant's Response to Plaintiff's Statement of Facts; Plaintiff's Reply to Defendant's Opposition to Motion for Summary Judgment ("Pl.'s Reply"); Plaintiff's Motion for Request for Admissions; Defendant's Motion to Stay Discovery ("Def.'s Mot. to Stay"); Plaintiff's Response in Opposition to Defendant's Motion to Stay Discovery ("Pl.'s Opp'n to Stay"); and Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Stay Discovery ("Def.'s Reply to Stay").  The Court also considered the exhibits attached to the following court filings that were referenced in the parties' arguments: Defendant's Memorandum of Points and Authorities in Support of Defendant's Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, October 14, 2003 ("Def.'s Oct. 14, 2003 Mem.") and Plaintiff's Memorandum in Support of Motion for Summary Judgment and a Default Judgment, February 12, 1999 ("Pl.'s Feb. 12, 1999 Mem.").

Center, Pl.'s Mot. at 4, and licensed to practice law in the Commonwealth of Pennsylvania.[6]

Memorandum Order (Aug. 24, 2000) at 2. She also holds a masters degree in economics and is a

former assistant professor of economics. Pl.'s Mot. at 3. The plaintiff was hired on September

6, 1977, by the Department of Transportation as an Economist in the Office of the Assistant

Secretary for Policy and International Affairs at the GS-0110-11 pay level. Id. ; Def.'s Mem. at

5. At the time of the termination of her employment by the defendant in January of 1988, Pl.'s

Mot. at 21; Def.'s Mem. at 15, the plaintiff's pay scale had increased to the GM-0110-14 level.

Def.'s Oct. 14, 2003 Mot., Exhibit ("Ex.") 22, (Mar. 18, 1987 Equal Employment Opportunity

Complaint) ("Mar. 18, 1987 Admin. Compl.")).[7]

1.    **The Alleged Discriminatory Acts Against the Plaintiff Occurring Between 1979 and 1986[8]**

From 1979 until 1985 the plaintiff received several satisfactory performance appraisals,

and several personal letters from other agencies and organizations expressing satisfaction with

the performance of her job. Pl.'s Mot., Ex. 2 (Performance Appraisals); id. at Ex. 3 (Letters of

---

[6]     Unless otherwise indicated, all of the facts set forth in this opinion are either admitted by both parties or are otherwise undisputed. To the extent that the parties' briefing on their cross-motions relied upon any unsubstantiated factual allegations, those allegations cannot serve as the basis for the Court's resolution of the motions. See Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (internal quotation marks omitted) (indicating that the nonmoving party cannot rely on "mere allegations or denials"); Exxon Corp. v. FTC, 663 F.2d 120, 126-27 (D.C. Cir. 1980) (stating that "conclusory allegations unsupported by factual data will not create a triable issue of fact").

[7]     There is some disagreement as to when the plaintiff's termination became official. The plaintiff claims that her "alleged removal from federal service [took effect] on January 4, 1988," Pl.'s Mot. at 21, while the defendant maintains that the "[p]laintiff was officially [removed] on January 7, 1988, when agency personnel filled out the Department's Clearance Certificate," Def.'s Mem. at 15. Regardless of the discrepancy, the exact termination date is not material to the Court's disposition of the parties' motions.

[8]     The facts occurring during this time period relate to the plaintiff's first five claims, which have already been all dismissed by the Court. The defendant has narrowed its statement of the facts to the time period of the alleged relation, and thus, does not reference many of the plaintiff's factual allegations in its motion for summary judgment. Def.'s Mem. at 5 n.1. Nevertheless, as the Court explained when it dismissed the other claims, "the dismissed claims may still constitute relevant background evidence in the case," Memorandum Order at 23 (Aug. 24, 2000) (quotation marks omitted), and to the extent that the factual allegations relevant to those claims are also relevant to the plaintiff's retaliation claim, references to them will be made by the Court.

Gratitude).  Also, during the first two years of her employment, the plaintiff was twice promoted. Id. at 4.

Shortly after the plaintiff "entered the four-year, evening juris doctor program at Georgetown University Law Center," in August 1981, Edward Oppler, the Deputy Director of the Office of International Policy, submitted papers relating to the plaintiff's possible promotion to a GS-14 position.  Id. at 4.  In March of 1982, before any decision on the promotion was made, the plaintiff took annual leave, missing a meeting as a result of her absence.  Id.  Mr. Oppler "requested that [another employee] call [the] plaintiff at home to ask whether she wanted to attend [the meeting,]" and he requested that the Office of Personnel "discontinue processing [the] previously submitted papers for [the] plaintiff's promotion[,]" as a result of her absence. Answer ¶¶ 7-8.  Despite what had occurred in early 1982, in October of that year Mr. Oppler selected the plaintiff "for a GM-0110-14 Economist position . . . as a result of an advertised vacancy through the merit promotion process."  Id. ¶¶ 7, 12; Pl.'s Mot. at 6.

It was after she achieved the pay scale rank of GM-0110-14 that the plaintiff alleges the discrimination against her began.  She asserts that she was discriminated against when: (1) her colleague, Rosalind Ellingsworth, a Caucasian female, "took credit for [the plaintiff's] work…and represented it as her own[;]" (2) her superiors – including Mr. Oppler, Vance Fort, and Assistant Secretary of Transportation, Judith Conors – made a  "specific effort . . . to advance [Ms. Ellingsworth] from a consultant . . . to a supervisory employee[,]" while the plaintiff's employment was not advanced; and (3) "[w]hite staff members received accommodations and other job benefits as a result of expressing their concerns about the issues[,]" whereas the plaintiff did not receive these benefits.  Pl.'s Mot. at 6-7.  In addition, the plaintiff alleges that during a September 1981 meeting in Cambridge, Massachusetts, that she did

not attend, "Ms. Ellingsworth and [another colleague] regularly made jokes about [the plaintiff's] ability to perform [her] job and attend law school." Id. at 8.

As a result of these alleged events, sometime in 1983, the plaintiff asserts that she "met with Wilbur Williams, a special assistant to the Director of Civil Rights for the Office of the Secretary [of Transportation and] told him of the disparate treatment," her failure to get promoted, and "other matters." Id. at 9. The plaintiff contends that the discrimination continued after her meeting with Mr. Williams, including that a white co-worker was sent on foreign travel, while the plaintiff was not, id., and that a colleague, Frances Murphy, received a promotion, while the plaintiff did not, Pl.'s Mot. at 10-11. The plaintiff also claims that during negotiations with Japan in March of 1985, she "was publicly humiliated in front of representatives of the Department of State, the airlines, the trade organizations, and other federal agencies," when she was given "no role" in the negotiations. Id. at 11. As a result of what had occurred, the plaintiff felt forced to accept a temporary detail assignment working in the Office of Transportation, Regulatory Affairs, Regulatory Review and Planning Division. Id. at 11-12. She remained on that detail assignment from April 1, 1985 until early 1986, and claims that during the detail "she was never given a performance [evaluation.]" Id.

While she was detailed in her temporary assignment in August 1985, the plaintiff "applied for a Supervisory Transportation Industry Analyst Position . . . . involving the identical work [she] had been involved in [throughout her career]," but, according to the plaintiff, the job was given to a "less qualified [and] less educated" white male instead. Id. at 14. Thereafter, in early 1986, the plaintiff alleges that she "was given another detail assignment to the Office of Special Programs," id. at 12, and in August 1986 was provided a form of evaluation evidenced by a handwritten note from the Office of the Assistant Secretary for Policy and International

Affairs stating that her performance was "fully successful." Pl.'s Feb. 12, 1999 Mem., Ex. 5 (Note Discussing Plaintiff's Evaluation); Pl.'s Mot. at 13.

 2. **Alleged Discriminatory Acts Against the Plaintiff Occurring Between December 1986 through January 1988**

As a result of her request for a transfer, the plaintiff was scheduled to be transferred to a new position on December 14, 1986. Pl.'s Feb. 12, 1999 Mem., Ex. 6 (Letter Regarding Personnel Matters and Requesting Performance Evaluations from August, 1985 through July 1986); Def.'s Oct. 14, 2003 Mem., Ex. 1 (Letter of Warning from Bruce Butterworth dated Dec. 16, 1986) ("Dec. 16, 1986 Letter of Warning"). Prior to the transfer, on December 8, 1986, the plaintiff met with her anticipated new superiors, Arnie Levine and Bruce Butterworth, to discuss the new position, Def.'s Oct. 14, 2003 Mem., Ex. 1 (Dec. 16, 1986 Letter of Warning), and the plaintiff maintains that they discussed with her "the addition of legal skills in the position description." Id., Ex. 6 at 3 (Notes from the Plaintiff's Personal Files dated March 11, 1987). The plaintiff then prepared a letter that she sent to the Assistant Secretary for Administration requesting that "no personnel actions of any kind [be] implemented" until appropriate evaluations and appraisals based on the plaintiff's responsibilities from August 1985 through 1986 were completed, id., but no action was ever taken as a result of her request. Pl.'s Mot., Ex. 6 at 1 (Dec. 17, 1986 Letter to Jon Seymour from Connie Reshard). The plaintiff states that she informed Mr. Levine and Mr. Butterworth in the December 8, 1986 meeting that "she would be happy" to assume "legal work provided that she [was] compensated with a quality in-step in salary." Id., Ex. 6 at 3 (Notes from the Plaintiff's Personal Files dated March 11, 1987).

On December 15, 1986, her new supervisor, Mr. Butterworth, reportedly sought out the plaintiff to give her an assignment, but was unable to locate her. Def.'s Oct. 14, 2003 Mem., Ex. 1 (Dec. 16, 1986 Letter of Warning). As a result, he left a note "asking [her] to meet [him] in

[his] office at 9:30 am to discuss [the assignment that she was] required to do." Id. When the plaintiff "did not arrive at 9:30 a.m. [or] contact [him] to explain why," Mr. Butterworth "went to [her] office and knocked," and the plaintiff responded that she "could not speak to [him]." Id. Mr. Butterworth informed the plaintiff that "[he] needed to see [her] in 15 minutes" in his office, but the plaintiff nonetheless "failed to appear at [his] office." Id. Consequently, Mr. Levine, the plaintiff's other supervisor, "left a message . . . asking [her] to provide an update on [her] preparation of [the assignment for Mr. Butterworth]." Id. Again, she failed to respond, but later that day "called a Secretary in another division from a Doctor's office and asked for two hours [of] sick leave [without permission or giving notice]." Id. As a result of the plaintiff's behavior, on the next day, December 16, 1986, Mr. Butterworth delivered a Letter of Warning memorializing the events of December 15, 1986. Id. The letter concluded that the plaintiff "failed entirely to meet [her] standard" regarding the assignment by "[n]ot attending meetings when requested by [her supervisors], without offering any explanation, and refusing to do assignments," actions which were "unbecoming [of] a senior staff member" and which "[would] not be tolerated." Id. The letter stated that "in the future, [the plaintiff must] request sick leave . . . in advance, and always provide reasonable notice." Id.

Thereafter, on December 18, 1986, the "[p]laintiff contacted an [Equal Employment Opportunity ("EEO")] officer[,]" Pl.'s Mot. at 16, to informally discuss what "she felt was racial discrimination toward her[,]" Def.'s Oct. 14, 2003 Mem., Ex. 21 at 1 (March 3, 1987 EEO Counselor's Report ("EEO Counselor's Report")). The EEO counselor and the plaintiff met on two occasions in January 1987, id., but there is no evidence that she filed a formal complaint at that time.

On February 11, 1987, Mr. Butterworth and the plaintiff discussed two new assignments

concerning which the plaintiff agreed to provide written work products, but other than a short handwritten note regarding one of the assignments, the plaintiff "failed to produce the work on…February 17 and 18, 1987 [and did not attempt] to request an extension or to explain in any way why [she] had not produced the work." Id., Ex. 2 at 2 ("March 10, 1987 Letter of Warning"). As a result of these events, on March 3, 1987, the parties met "to discuss the scope of [her] position description." Id. On March 10, 1987, Mr. Butterworth sent to the plaintiff a second letter of warning ("March 10, 1987 Letter of Warning") regarding the February 11, 1987 assignments. Id. The letter also discussed the plaintiff's purposeful "[failure] to appear at [a] staff meeting" that took place on February 18, 1987. Id. at 3. The letter warned that "any further misconduct or refusal to perform assignments could result in more severe disciplinary action[.]" Id. at 4.

On March 18, 1987, the plaintiff formally filed an administrative complaint with the Equal Employment Opportunity ("EEO") officer alleging racial discrimination. Def.'s Oct. 14, 2003 Mem., Ex. 22 at 1-10 (Complaint of Discrimination in the Federal Government dated March 18, 1987) ("Original Administrative Complaint"). The Original Administrative Complaint described all of the alleged acts of discrimination included in the plaintiff's complaint, as well as other charges not alleged in her complaint. Id., Ex. 22 at 2-5. The Original Administrative Complaint sought equitable relief in the form of a promotion and retroactive performance appraisals, as well as monetary relief in the form of back pay and general damages resulting from purported damage to her "professional reputation[,]" and "[a] prohibition against the assignment of legal analyses to [her.]" Id., Ex. 22 at 9. The plaintiff twice amended her Original Administrative Complaint, initially on March 19, 1987, id., Ex. 22 at 11-20 (Amendment to Discrimination Complaint of March 18, 1987) ("First Amended Administrative

Complaint"), and again on March 27, 1987, id., Ex. 22 at 21-30 (Second Amended Complaint dated March 27, 1987) ("Second Amended Administrative Complaint").

On May 21, 1987, Mr. Butterworth gave the plaintiff a new work assignment. Def.'s Mem. at 7; Def.'s Oct. 14, 2003 Mem., Ex. 3 (Letter of Reprimand Dated June 16, 1987) ("Letter of Reprimand"). Six days later, he inquired as to the plaintiff's progress on the assignment, and she indicated that she had no work product for him at that time. Def.'s Oct. 14, 2003 Mem., Ex. 3 (Letter of Reprimand) at 1. Consequently, Mr. Butterworth scheduled a meeting with the plaintiff and requested that she bring the completed work product to the meeting. Id. The plaintiff again did not have the work product for Mr. Butterworth by the time of the meeting, so on June 2, 1987, he formally requested in writing that she provided him with the work product, stating that the plaintiff's refusal to produce the work product by the end of the day would be considered a "refusal to complete [her] assigned work," and would result in "appropriate action" being taken. Id. at 2 & Attach. 2 (June 2, 1987 Note to Connie Reshard). When the plaintiff subsequently failed to produce the requested work product, Mr. Butterworth "reassigned the work to another staff member," and issued a letter of reprimand to the plaintiff on June 16, 1987. Id. The plaintiff responded to the letter of reprimand on June 25, 1987, refuting the charge that she failed to complete any assignment. Def.'s Oct. 14, 2003 Mem., Ex. 4 (Response Memorandum) at 1-3. In addition, she alleged that she was racially discrimination against in a February 1987 staff meeting when she was "compared to a white economist who is a grade lower." Id. at 2.

On the same day that she responded to Mr. Butterworth's letter, the plaintiff amended the administrative complaint she had filed with the EEO counselor for a third time, incorporating the events surrounding the June 16, 1987 letter of reprimand. Def.'s Oct. 14, 2003 Mem., Ex. 22 at

35 (Letter to Robert Coates dated July 15, 1987 Amending the Administrative Complaint)

("Third Amended Administrative Complaint").  The plaintiff stated that the letter of reprimand

"contained gross inaccuracies and allegations of misconduct" and recommended that she should

not receive an upcoming semi-annual performance evaluation because she "would be evaluated

for a one year period over a 90 day period," which amounts to her "being treated different from

other white employees . . . because [she is] [b]lack."  Id.  Despite her objection, the semi-annual

performance evaluation was issued, with the plaintiff receiving a "fully successful" rating.

Def.'s Oct. 14, 2003 Mem., Ex. 6 (Performance Management and Recognition System,

Performance Appraisal Form for the Period of December 15, 1986 - July 31, 1987) ("1987

Performance Evaluation").  The evaluation referenced the satisfactory completion of several

assignments, but also included copious remarks noting the "inordinate amount of managerial

time and effort spent to secure her cooperation in meeting the job requirements[.]"  Id. at Attach.

1.  In addition, the evaluation noted that the plaintiff gave the reviewer, Mr. Butterworth, "a copy

of another staff member's work with a cover note, purporting that work as her own . . . as a sign

of defiance."  Id.  The evaluation also reiterated that the plaintiff's "refus[al] to attend staff

meetings."  Id.

        During the time when the above described events were occurring, the plaintiff was also

seeking a different position.  On July 22, 1987, she applied for a position as a Trade Policy

Analyst with the pay scale grade level of GM-301-15.  Def.'s Mem. at 9.  From the candidates

who applied for the position, Mr. Levine ultimately hired another black female candidate based

on what he expressed was her ten years of experience and superior overall performance in her

previous position.  Id. at 9-10.  After the plaintiff was not selected for the Trade Policy Analyst

position, she amended her Administrative Complaint for a fourth time to add allegations that her

non-selection for the Trade policy Analyst position evidenced racial discrimination. Def.'s Oct. 14, 2003 Mem., Ex. 22 at 32-34 (Letter to Robert Coates dated August 17, 1987 Amending the Administrative Complaint) ("Fourth Amended Administrative Complaint").

On September 2, 1987, Mr. Butterworth gave the plaintiff notice of a proposed suspension "from pay and duty status for one calendar day from [her] position of Economist." Def.'s Oct. 14, 2003 Mem., Ex. 8 (Notice of Proposed Suspension dated September 2, 1987) ("Notice of One Day Suspension"). He told the plaintiff that the proposed suspension stemmed from the plaintiff's continued refusal to attend staff meetings without providing any advance notice. Id. at Attach. (Sept. 3, 1987 Letter to Connie Reshard). The letter was sent both to the plaintiff by registered mail and placed on her desk along with a note from Mr. Butterworth stating that he "will not hesitate to propose increasingly severe disciplinary action" if the plaintiff's "[a]cts of insubordination" continued, specifically, not attending staff meetings. Id. Shortly thereafter, Mr. Levine also sent the plaintiff a memorandum advising her of his "decision [to adopt] the September 2, 1987 proposal from [Mr.] Butterworth to suspend [her] from duty and pay status for one . . . calendar day," Def.'s Oct. 14, 2003 Mem., Ex. 9 (Notice of One Day Suspension dated Sept. 29, 1987), which, in addition to a second document, the plaintiff "refused to accept," Def.'s Oct. 14, 2003 Mem., Ex. 10 (Sept. 30, 1987 Letter to File by Arnold Levine).

On September 30, 1987, the plaintiff was provided notice of restrictions on her ability to take leave stemming from her absence from work during August and September. Def.'s Oct. 14, 2003 Mem., Ex. 7 (Notice of Leave Restrictions dated September 30, 1987) ("Notice of Leave Restrictions"). Accordingly to her employer's calculation, from August 2 through September 28, 1987, the plaintiff was "absent a total of 105 hours; 70 hours of sick, 12 hours of annual leave and 23 hours of AWOL . . .[or] approximately 30.5 percent of the 344 hours of available work

time" during that period. Id. The September 30, 1987 notice included the imposition of new procedures requiring that "annual leave must be requested and approved . . . in advance" by Mr. Butterworth, that "[s]ick leave shall be approved only when [the plaintiff is] incapacitated for duty" or receiving a medical procedure or when her "presence would jeopardize the health of fellow workers," and that "[i]f leave is not scheduled in advance because of any emergency situation, [the plaintiff] must . . . [speak directly to Mr. Butterworth or his office] by 9:15 a.m. on the day leave is to be used." Id.

Without exhausting her administrative remedies related to her EEO complaint, which was the Court's basis for dismissing all the claims but the one presently before it, the plaintiff filed a complaint with the Court on October 15, 1987, seeking, among other relief, a request for a temporary restraining order to enjoin all further personnel acts by the defendant.

Six days later, on October 21, 1987, Mr. Butterworth sent notice of a proposed fourteen-day suspension from pay and duty for "(1) [r]ude, disrespectful, and insubordinate conduct toward [Mr. Levine, the Director of her office and Mr. Butterworth, her immediate supervisor;] (2) [r]efusal to accept and/or acknowledge official correspondence from [her superiors;] (3) [f]ailure to attend staff meetings, as directed[;] (4)[f]ailure to follow procedures outlined in [the Notice of Leave Restrictions; and] (5) Absence Without Leave." Def.'s Oct. 14, 2003 Mem., Ex. 11 (Notice of Proposed Suspension dated October 21, 1987) ("Proposal for a 14-Day Suspension") at 1. The proposal included factual allegations for each of the five reasons for the proposed suspension, including the plaintiff's consistent refusal to accept or acknowledge official documents including the proposal itself. Id., Ex. 11 at 1-6. Among other correspondence, attached to the suspension proposal received by the Court were three notes from the plaintiff to Mr. Levine. The first two notes were dated October 5, 1987, and stated

collectively that the plaintiff's superiors "have set in place a systematic and deliberate environment of harassment and oppression," and that she will only meet with her supervisors "provided that Matthew Scocozza, [the Assistant Secretary of Transportation,] is also present." Id., Ex. 11 at 8-9. The third note, dated October 7, 1987, stated that the plaintiff took administrative leave on that day "expressly for the purpose for working an appropriate response [to her one day suspension on October 6, 1987.]"[9] Id. On November 3, 1987, Mr. Levine formally approved Mr. Butterworth's proposal "to suspend [the plaintiff] from duty and pay status for fourteen (14) calendar days from her position of Economist" beginning on November 8, 1987. Def.'s Oct. 14, 2003 Mem., Ex. 12 (Notice of Suspension dated November 3, 1987). Once again, the plaintiff refused to accept delivery of the notice. Id. at 2. On December 2, 1987, Mr. Butterworth issued a notice proposing the removal of the plaintiff from federal service. Def.'s Oct. 14, 2003 Mem., Ex. 13 (Notice of Proposed Removal dated Dec. 2, 1987). Specifically, the notice of proposed removal noted that following her suspension, the plaintiff missed two additional staff meetings on November 25 and December 2, 1987. Id. at 1-2. The plaintiff, after being granted an extension to respond to the her proposed termination, responded by hand delivering a letter to William Dempster, the Assistant United States Attorney assigned to the plaintiff's court case, which stated that Mr. Butterworth "refused to apologize or make any attempt at amends" for an alleged "racially charged" insult made to her. Def.'s Oct. 14, 2003 Mem., Ex. 14 (Letter to William Dempster dated December 18, 1987) ("Plaintiff's Response to Proposed Removal"). Presumably finding the plaintiff's response inadequate, on December 21,

---

[9] As an alternative position, the plaintiff maintains that her removal is invalid because "Mr. Peak has no authority to sign for Mr. Scocozza." Pl.'s Mot. at 21. Due to the Court's ultimate finding that the evidence does not support the plaintiff's retaliation claim, it need not address the issue of whether Mr. Peak's signature on behalf of Mr. Scocozza was valid.

1987, Mr. Levine officially removed the plaintiff from her position for "the offense of continuing to disobey direct orders as evidenced by [her] refusal to attend two staff meetings." Def.'s Oct. 14, 2003 Mem., Ex. 17 (Decision to Remove Memorandum dated Dec. 21, 1987) at 1. He concluded that despite "the letters of warning, the letter of reprimand, and the suspensions [that she was issued for the same or similar offenses, her] continued disobedience of direct orders [did] not warrant mitigating the penalty of removal." Id.

Consistent with what had occurred when efforts had been made to provide her with documentation concerning the previous personnel actions, the plaintiff refused to accept the memorandum advising her of her termination. Def.'s Oct. 14, 2003 Mem., Ex. 18 (Delivery of Decision to Remove dated December 23, 1987). After several attempts to personally deliver the removal memorandum, on December 22, 1987, Mr. Levine "placed the envelope in her office on her chair . . . . [He] also directed [his] secretary to mail two copies . . . to [the plaintiff's] residence, both via registered mail." Def.'s Oct. 14, 2003 Mem., Ex. 19 (Declaration of Arnold L. Levine) ¶ 6. On December 23, 1987, a third copy of the memorandum, with "a cover note asking [the plaintiff] to meet [Mr. Levine] at [his] office at 10:00 a.m. on January 4, 1988," to complete the process of terminating her employment, was hand delivered by another Department of Transportation employee "to the desk clerk at [the plaintiff's] residence." Id. ¶ 7. The plaintiff "returned the envelope containing the removal memorandum [Mr. Levine] placed in her office," id. ¶ 8, with a note attached stating that "[a]ll communications from any official or [Department of Transportation] employee regarding issues which are now pending [in Court] should be transmitted [to] U.S. [A]ttorney William Dempster[,]"[10] id., Attach. 3. When the

---

[10]     It is disputed whether the plaintiff received one or multiple packages of documents from the Department of Transportation. Compare Pl.'s Feb. 12, 1999 Mem., Ex. 8 (Affidavit of Connie Reshard) with (Affidavit of
(continued . . . )

plaintiff "did not meet with [Mr. Levine] on January 4, 1988, . . . [or] begin the process of being checked out of the Department . . . the locks to her office were changed."  Id. ¶ 9.  On the same day, Mr. Levine submitted a Request for Personnel Action form for the termination of the plaintiff's employment, effective that same day.  Pl.'s Feb. 12, 1999 Mem., Ex. 1 (Request for Personnel Action Form).  The form, which was approved by Mr. Scocozza, through his assistant John Peak, notes the reasons for removal as the plaintiff's "continuing to disobey direct orders as evidenced by [her] refusal to attend two staff meetings."  Id.

**B.      Procedural History**

**1.        Proceedings Preceding Assignment to this Member of the Court**

The complaint, which was originally assigned to another former member of the Court, originally included seven claims: (1) an "adverse promotion action" that occurred in 1982 when Edward Oppler, "a white male first and second line supervisor withdrew a request for promotion of [the plaintiff] on the basis of race," Compl. ¶ 7; (2) the creation by the plaintiff's supervisors from 1982 to 1985 of "[a]n environment of professional suppression which was motivated by [the plaintiff's] race," id. ¶ 16, that included, inter alia, never being given assignments requiring travel and having her "responsibilities . . . reduced and transferred to a white co-worker," id. ¶ 18; (3) "racial discrimination designed to force [the] plaintiff to leave the agency," id. ¶¶ 22-39, including being "detailed [to] temporary status indefinitely from April 1985 until December 1986 . . . despite promises from [an] Assistant Secretary . . . that she would be given [a] permanent position on his immediate staff . . . on or about January 30, 1986," id. at ¶ 23; (4) the "Performance and Management Recognition System[, the department's official performance

evaluation system, was] used for [r]acial [d]iscrimination" against the plaintiff, id. ¶ 41; (5)

racial discrimination in 1985 when the plaintiff was "denied a promotion opportunity . . . [even

though she was] the most qualified candidate[,]" id. ¶ 50; (6) "retaliation," encompassing events

"[b]eginning in December 1986 . . . with two letters of warning based on unsubstantiated charges

of misconduct and unprofessionalism[,]" id. ¶ 54 and ending with "[t]he [plaintiff's] suspension

on the [sixth] of October," id. ¶ 79; and (7) the requirement for a government employee to "first

pursue the administrative process within the agency[,]" id. ¶ 84, which the plaintiff contends is

"violative of the Due Process Clause [of the Constitution,]" id. ¶ 90.

Subsequent to the filing of her complaint, the plaintiff "filed a number of motions seeking

different forms of injunctive relief," including requiring the defendant to pay her for days when

she was considered absent without leave and "prevent[ing] the defendant from retaliating against

her and . . . removing her from federal service." Memorandum Order (Aug. 24, 2000) at 5. The

defendant moved to dismiss the plaintiff's complaint on January 4, 1988. See generally Def.'s

Jan. 4, 1988 Mem. On January 13, 1988, the plaintiff filed a supplemental pleading adding to

her sixth claim for retaliation events that occurred after the filing of her complaint, i.e. after

October 16, 1987. Plaintiff's Motion to Supplement Pleadings (Jan. 13, 1988); Plaintiff's

Corrected Copy Supplemental Pleading For Declaratory Judgment and Injunctive Relief (Jan.19,

1988).

Over a decade later, and after dozens of extensions of time for responses, several appeals

to the District of Columbia Circuit, and the filing of other motions, including a motion by the

plaintiff for Summary Judgment filed in February of 1999, the judge previously assigned to

preside in this case issued his Memoranda Opinion on the defendant's January 4, 1988 motion to

dismiss and for partial summary judgment, dismissing the first five counts of the complaint

based on the plaintiff's failure to exhaust her administrative remedies during the applicable time periods, Memorandum Order (Aug. 24, 2000) at 9-14, and because she "ha[d] not demonstrated that there was a continuing violation or that she is entitled to equitable tolling[,]" id. at 23. The Court also dismissed the seventh count of the complaint "on the merits because Title VII does not violate the Due Process Clause of the United States Constitution," id., by requiring "that a 'complainant seeking redress for racial discrimination in the Federal Competitive Service first pursue the administrate process within the agency,'" id. at 15. With regard to the remaining retaliation claim (the claim that is the subject of this opinion), the Court found that "it appear[ed] that at least some parts of the [retaliation claim were] properly before the Court[,]" but because the Court could not discern the nature or factual basis of the retaliation claim from the pleadings, or whether the plaintiff had exhausted her administrative remedies with respect to this claim, it declined to address the merits of the claim until such time as the parties could narrow the issues before the Court and provide clarification as to the exact nature of the claim. Id. at 21, 23. Essentially, the Court sought to have the plaintiff identify which among her numerous allegations set forth in her judicial complaint supported her post-complaint retaliation theory, which was first alleged in her January 13, 1988 supplement to her complaint.

On May 14, 2003, less than a month after the Court issued a second request for further clarification as to the plaintiff's retaliation claim, the plaintiff filed a renewed motion for summary judgment that incorporated by reference the exhibit evidence that she submitted in support of her earlier February 12, 1999 motion for summary judgment, despite the Court's denial of her earlier motion based on the conclusion that the evidence upon which she relied did

not entitle her to summary judgment.[11]  Pl.'s May 14, 2003 Mem.  The defendant filed a cross-motion for summary judgment on October 14, 2003, submitting along with that cross-motion twenty-two new exhibits not previously placed in the record.[12]  See Def.'s Oct. 14, 2003 Mem., Exs. 1-28.

## 2.    Proceedings After Assignment to this Member of the Court

Before the Court could decide the outstanding cross-motions for summary judgment currently before the Court, the member of the Court previously assigned to the case took medical leave, and the case was subsequently reassigned to this member of the Court on October 25, 2007.  On December 12, 2007, the Court held a hearing in order to clarify the remaining issues regarding the plaintiff's retaliation claim, which all parties agreed was the only claim still pending before the Court.  Transcript of Proceedings before the Court (Dec. 12, 2007) at 8-9.  However, the Court granted the plaintiff's request to file a motion seeking its reconsideration of the October 2000 Order dismissing her other claims "based upon what [she] believe[d was] a change of law coming from the Supreme Court[.]"  Id. at 11; see Plaintiff's Motion for Reconsideration (Feb. 25, 2008).  The Court eventually denied the motion for reconsideration holding that none of the cases cited by the Court in its October 2000 decision "ha[d] been overruled or seriously distinguished . . . , and [that] the plaintiff ha[d] not alleged any new fact demonstrating that she proceeded through the proper administrative channels as required by the

---

[11]    It should be noted that while the plaintiff did not submit any new exhibits with her renewed motion for summary judgment, she did file Plaintiff's Statement of Material Facts as to Which There is No Issue in Support of Motion for Summary Judgment (May 14, 2003).  However, that statement of facts merely reiterated her prior allegations.

[12]    Much of the factual background of this Memorandum Opinion is derived from these twenty-two exhibits.  Perhaps most important were the inclusion of the two letters of warning, the letter of reprimand, and the plaintiff's own administrative complaints.  None of this evidence was provided by the plaintiff in conjunction with her complaint, her supplement to her complaint, or her prior motions for summary judgment.

federal regulations . . . or cited any legal authority that relieves her of the obligation of doing so." Order (Mar. 2, 2009) at 2. Having denied without prejudice the parties' cross-motions for summary judgment pending its resolution of the plaintiff's motion for reconsideration, the Court then ordered the parties to re-file their cross-motions on the theory "that the defendant retaliated against the plaintiff for pursuing a legal remedy for her claims of discrimination." Id. at 3.

3.      The Parties' Renewed Motions for Summary Judgment & the Defendant's
        Motion to Stay Discovery

In response to the Court's Order of March 2, 2009, on May 19, 2009, the defendant filed his renewed motion for summary judgment, as well as a memorandum in support of the motion and a statement of facts which he represents are not in dispute. The defendant's memorandum specifically addresses "the claims raised in [the plaintiff's] Sixth Claim dealing with the allegations of reprisal by the agency." Def.'s Mem. at 4. The defendant argues that to the extent "[the plaintiff's] one day suspension, her fourteen[-]day suspension, her leave restriction, and her removal from Federal Service are [acts of] retaliation, they must fail [because of the plaintiff's] failure to timely file an administrative EEO complaint or to amend her pending complaint." Id. at 25. The defendant also argues that "[t]he two letters of warning, the letter of reprimand, a fully successful mid-year review, the placement on leave restriction, the alleged 'racial remark,' work assignments, and the staff listings clearly did not change [the] plaintiff's pay, grade, or materially affect her working conditions or cause material harm . . . [and] do not constitute materially adverse actions[.]" Id. at 26-27. In addition, the defendant argues that the plaintiff cannot demonstrate sufficient evidence that her non-selection for promotion, "her two suspensions, and her removal were motivated by her prior EEO activity." Id. at 30.

In response, on June 2, 2009, the plaintiff filed her cross-motion for summary judgment on her retaliation claim. The plaintiff's motion does not address the defendant's argument in any

specific or direct manner, or the Court's request for a distillation of the factual allegations and pending legal arguments, but, for the most part, re-alleges all of the facts and claims set forth in her complaint and other pleadings over the past 22 years, including that her arguments in her motion for reconsideration were improperly rejected by the Court. See generally Pl.'s Mot. However, the plaintiff's renewed motion also makes several novel arguments. First, the plaintiff alleges that because "[t]he Complaint contains a prima facie case on the issue of reprisals and retaliation," she is entitled to relief under the framework of McDonnell Douglas v. Green, 411 U.S. 792 (1973). Id. at 24. In other words, the plaintiff claims that she has proven that the "[d]efendant has punished the [p]laintiff and created an atmosphere of fear, for either speaking to members of the EEO staff or the subsequent filing of the administrative complaint in March 1987 or commencing this litigation in October 1987." Id. at 24. Second, the plaintiff argues that "the [C]ourt should not consider denying the plaintiff's motion without authorizing discovery in this case." Id. at 27. Third, the plaintiff argues that the "[d]efendant treated other applicants differently than the plaintiff when assessing [her] qualifications [for a promotion in 1987.]" Id. at 31-32. Fourth, the plaintiff argues that "not every unlawful act has to be a separate and discreet act under a continuing pattern of [discrimination claim]." Id. at 25-26.

The defendant opposed the plaintiff's motion arguing that (1) even if the plaintiff did establish a prima facie case of discrimination, that "does not entitle her to relief because the defendant has articulated non-discriminatory reasons for its actions[,]" Def.'s Opp'n at 3; (2) the plaintiff has failed to present credible evidence of pretext, id., and (3) that the plaintiff "seeks to revive for the third time the claims that were dismissed [in 2000 and reconsidered by this Court in 2008] to defeat the failure to exhaust argument applicable to her pending claims of retaliation[,]" id. at 9. The defendant notes that "except for the 1987 non-promotion claim and

the letters of warning, [the] plaintiff failed to exhaust the necessary administrative remedies as to the remaining [S]ixth [C]laim of retaliation."[13] Id. The plaintiff replied to the defendant's opposition to her summary judgment motion arguing that (1) the plaintiff's retaliation encompasses the allegations made in the first five counts of her complaint and that "[t]hose facts did not disappear because the defendant selectively withheld information regarding contacts the plaintiff made with the EEO [c]ounselors[,]" Pl.'s Reply at 3; (2) her reliance "on the existence of an underlying charge of discrimination is sufficient to support a retaliation charge" and that "Judge Penn wrongly assessed this case and Judge Walton accepts [that ruling,]" id. at 6; and (3) because "many adverse personnel actions occurred during the pendency of this litigation, [the plaintiff] is not required to further amend the administrative complaint[,]" id. at 7.

The plaintiff also made a request for admissions by the defendant on June 1, 2009, Plaintiff's Notice of Serving Admissions dated June 1, 2009, which was followed on June 11, 2009, by the defendant's motion to stay any discovery requests due to the need to resolve the pending motions that were before the Court, and the plaintiff's past reliance on the sufficiency of the record in support of her earlier motions for summary judgment. Def.'s Mot. to Stay at 1. The plaintiff opposes the defendant's motion to stay discovery arguing that (1) "the defendant controls all of the evidence and the employees [and] former employees," Pl.'s Opp'n to Stay ¶ 8;

---

[13] The defendant therefore appears to concede that the plaintiff exhausted her administrative remedies with respect to the letters of warning and the 1987 non-promotion. See Def.'s Opp'n at 9; Def.'s Mem. at 26. As explained below, however, even if the plaintiff did exhaust her administrative remedies and included these discrete acts in her administrative complaint, summary judgment would nonetheless have to be granted to the defendant because the plaintiff cannot prove that the defendant's explanation for his actions are pretextual. Moreover, given the plaintiff's failure to meaningfully pursue the administrative complaint and the amendments that she filed, the Court also could conclude that the plaintiff failed to exhaust her administrative remedies for any of her claims in light of her abandonment of the administrative process. See Butler v. West, 164 F.3d 634, 643 (D.C. Cir. 1999) (surveying cases addressing the abandonment of administrative complaints). But, giving the plaintiff the benefit of the doubt, as even the defendant seems willing to do, Def.'s Mem. at 26, the Court will assume the administrative exhaustion of the plaintiff's theory of retaliation arising from her two letters of warning, the letter of reprimand, her mid-year review, the leave restrictions, the alleged racial remark, her work assignments, and the listing of her name in the staff directory below employees of a lower grade.

(2) the "limited discovery is necessary to show that some facts are not in dispute and some facts presented by the defendant are unreliable[,]" id. ¶ 12; and (3) "the defendant filed the motion as a delay tactic[,]" id. ¶ 13.  The defendant replied to the plaintiff's opposition to his motion for the stay arguing that the plaintiff has waited years to make her request regarding this claim, has filed three of her own motions for summary judgment, and has been unable to give "specific reasons as to why she cannot present facts essential to her case."  Def.'s Reply to Stay at 1-2.

## II. LEGAL ANALYSIS

### A.     The Defendant's Motion to Stay Discovery

"[D]ecision[s] whether to stay discovery [are] committed to the sound discretion of the district court judge."  White v. Fraternal Order of Police, 909 F.2d 512, 517 (D.C. Cir. 1990).  The District of Columbia Circuit has held that the party seeking discovery bears the burden of identifying the facts to be discovered that would create a triable issue and the reasons why the party cannot acquire those facts without discovery to challenge a motion for summary judgment.  Byrd v. Envtl. Prot. Agency, 174 F.3d 239, 248 n.8 (D.C. Cir.1999) (citation omitted).  The party seeking discovery should also demonstrate a reasonable basis for believing that the requested discovery will uncover triable issues of fact.  Carpenter v. Fed. Nat'l Mortgage Ass'n, 174 F.3d 231, 237 (D.C. 1999).  The question in regards to summary judgment is not whether more evidence can be adduced that would assist a party's case, but whether "the record is adequate to determine whether the standards for the grant of summary judgment are met."  White, 909 F.2d at 517.

It is readily apparent from the record that the plaintiff has not established why her severely untimely attempt to reopen discovery – over twenty years after she commenced this litigation – should now be granted.  The plaintiff asserts that additional "[d]iscovery would aid

the determination of motives where written documentation can often be self-serving." Pl.'s Mem. at 27; see also id. at 30. However, the plaintiff herself has moved on several occasions for summary judgment. And, underlying her multiple requests for summary judgment, as must be for the Court to award such relief, was her representation that the evidence in the record was adequately developed to support summary judgment in her favor. The plaintiff is not entitled to continue her search for evidence, based on nothing more than her mere speculation that more evidence must be out there, thus burdening the defendants by having him try to find it, until she conceivably could gather enough evidence to survive summary judgment if such evidence even exists. Strang v. U.S. Arms Control & Disarmament Agency, 864 F.2d 859, 861 (D.C. Cir. 1989) (denying request for additional discovery as unnecessary where plaintiff merely represented "generally that discovery 'would be invaluable in this case' and would give her 'an opportunity to test and elaborate the affidavit testimony already entered'"); see, e.g., Byrd, 174 F.3d at 248 n.8 (citation omitted); Carpenter, 174 F.3d at 237. The plaintiff has had amble opportunity to gather evidence supporting her position, and the parties have already met and conferred concerning pretrial matters, filing their joint statement on August 11, 2003. The reopening discovery at this late date, long-after spoliation of the evidence is likely to have occurred (including faded memories) will add little, if any, strength to the plaintiff's position. The Court therefore is satisfied that the record "is adequate to determine whether the standards for the grant of summary judgment are met." White, 909 F.2d at 517, and accordingly it will grant the defendant's motion to stay the plaintiff's effort to acquire additional discovery.

**B.**      **The Plaintiff's Retaliation Claim**

Under Federal Rule of Civil Procedure 56(c), courts will grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). The Court must also draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The nonmoving party, however, cannot rely on "mere allegations or denials," Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248) (internal quotation marks omitted), and "conclusory allegations unsupported by factual data will not create a triable issue of fact." Exxon Corp. v. FTC, 663 F.2d 120, 126-27 (D.C. Cir. 1980). Instead, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis, internal quotation marks and citation omitted). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

If the Court concludes that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In other words, by pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. Id. at 322. On the other hand, the nonmoving party may defeat summary judgment through factual representation made in a sworn affidavit, Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999), or by providing "direct testimonial evidence," Arrington v. United States, 473 F.3d 329, 338 (D.C. Cir. 2006). Finally, it should be noted that because of the difficulty of establishing discriminatory intent, "an added

measure of rigor . . . or caution . . . is appropriate in [deciding] motions for summary judgment in employment discrimination cases." Aka v. Wash. Hosp. Ctr., 116 F.3d 876, 879-80 (D.C. Cir. 1997) (internal quotation marks and citations omitted), rev'd on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).

As noted earlier, the only claim remaining in this case is the plaintiff's retaliation claim alleging that the defendant retaliated against her after she contacted an EEO counselor, filed an administrative complaint, amended that complaint, filed this lawsuit. See generally Plaintiff's Corrected Copy Supplemental Pleading for Declaratory Judgment and Injunctive Relief (Jan.19, 1988). The plaintiff argues that the "[d]efendant has punished [her] and created an atmosphere of fear, for either speaking to members of the EEO staff or the subsequent filing of the administrative complaint in March 1987 or commencing this litigation in October 1987." Pl.'s Mot. at 24-25. The defendant, on the other hand, argues that the plaintiff (1) has failed to exhaust her administrative remedies regarding her suspensions, leave restrictions, and her removal from federal service, Def.'s Mem. at 25; (2) cannot demonstrate that she suffered a materially adverse personnel action with respect to the two letters of warning, the letter of reprimand, her mid-year review, her placement on leave restriction, the alleged racial remark, her work assignments and the location of her name in the staff directory, id. at 26-27; and (3) has failed to establish that the non-discriminatory reason for her non-selection for a promotion – her two suspensions – and her ultimate removal from her position were pretext for unlawful discrimination, id. at 30-35; Def.'s Opp'n at 4-8. For the reasons set forth below, the Court finds that the plaintiff has failed to exhaust her administrative remedies with respect to her suspensions, leave restriction, and eventual removal from federal service, and has failed to meet her burden to demonstrate that the actions of the defendant are legally actionable as acts of

retaliation.

### 1. The Plaintiff's Failure to Exhaust her Administrative Remedies

"It is well-established that a federal employee may assert a Title VII claim in federal court only after a timely complaint has been presented to the agency involved." Nurriddin v. Goldin, 382 F. Supp. 2d. 79, 92 (D.D.C. 2005). Thus "[a] federal employee filing a Title VII action must exhaust . . . her administrative remedies before seeking judicial review." Rhodes v. Napolitano, 656 F. Supp. 2d 174, 179 (D.D.C. 2009) (citing Brown v. Gen. Servs. Admin., 425 U.S. 820, 832-33 (1976)). Specifically, a federal employee must initiate contact with an EEO counselor within forty-five days of the date of the event believed to be discriminatory or retaliatory. 29 C.F.R. § 1614.105(a)(1) (2010). With regard to personnel actions, contact must occur within forty-five days of the effective date of the personnel action. Id. The EEO counselor must then conduct a final interview within thirty days of the employee's contact with the EEO counselor, otherwise, the counselor is required to notify the employee of her right to file an administrative complaint within 15 days of the notice. Id. § 1614.105(d). The administrative complaint may be amended at any time prior to the conclusion of the agency's investigation. Id. § 1614.106(d). An employee may bring a civil action within 90 days of receipt of notice of the EEO counselor's final action, id. § 1614.407(a), or 180 days from the filing of the complaint if no appeal or final action has occurred, id. § 1614.407(b). See also 42 U.S.C. § 2000e-16(c).

The Supreme Court has held, with regard to adverse employment actions, that each discrete adverse employment action triggers the statutory exhaustion requirement discussed above. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002); see also Ragsdale v. Holder, 668 F. Supp. 2d 7, 17 (D.D.C. Nov. 2, 2009). Therefore, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed

charges." Morgan, 536 U.S. at 113. In order to determine whether a claim must meet the administrative exhaustion requirement itself, "or whether it can piggy-back on another claim that has satisfied those requirements . . . , [the Court must decide whether the otherwise barred claim is for] a 'discrete' act of discrimination." Coleman-Adebayo v. Leavitt, 326 F. Supp. 2d 132, 137-8 (D.D.C. 2004); see Ragsdale, 668 F. Supp. 2d at 17.

Discrete acts of retaliation "such as termination, failure to promote, denial of transfer, or refusal to hire are individual acts that occur at a fixed time . . . [and] plaintiffs alleging such discriminatory action must exhaust the administrative process regardless of any relationship that may exist between those discrete claims and any others." Coleman-Adebayo, 326 F. Supp. 2d at 138 (citing Morgan, 536 U.S. at 114) (internal quotation marks omitted). "Individual acts of retaliation that form the basis of retaliation claims are also included within the Supreme Court's list of discrete discriminatory acts, and therefore[,] any claim stemming from those acts must be administratively exhausted." Id.; see Romero-Ostolaza v. Ridge, 370 F. Supp. 2d 139, 149 (D.D.C. 2005) (holding that "Morgan has, on the whole been understood to . . . bar [unexhausted claims of relation based on] discrete acts occurring after the time period, after the filing of an administrative complaint, when a plaintiff does not file a new complaint or amend the old complaint but instead presents these acts for the first time in federal court.").

It is the law of this case that "the plaintiff has not alleged any new fact demonstrating that she proceeded through the proper administrative channels as required by the federal regulations . . . or cited any legal authority that relieves her of the obligation of doing so[,]" with respect to the claims of discrimination and retaliation in the first five counts of her complaint. Order (Mar. 2, 2009) at 2 (citing Memorandum Opinion (Apr. 7, 2003) at 10-11). This Court has also found that the plaintiff failed to demonstrate any theory of continuing violation and was not entitled to

rely upon the doctrine of equitable tolling.  Memorandum Order (Aug. 24, 2000) at 23.  This decision was twice reconsidered by the Court upon motions of the plaintiff, and reaffirmed to be the law of the case.  See Order (Mar. 2, 2009); Memorandum Opinion & Order (Apr. 7, 2003).  Therefore, the Court need only examine the exhaustion of administrative remedies question with respect to the events giving rise to the remaining components of the plaintiff's retaliation claim.[14]

The plaintiff first contacted an EEO counselor on December 18, 1986, two days after she received her first letter of warning and four days after assuming her new position supervised by Mr. Butterworth and Mr. Levine.  Def.'s Oct. 14, 2003 Mem., Ex. 21 (EEO Counselor's Report).  The final meeting between the EEO counselor and the plaintiff took place on March 3, 1987, and it was then that "a notice of final interview was given to [the plaintiff]."  Id.  The plaintiff then filed her initial administrative complaint on March 18, 1987, Def.'s Oct. 14, 2003 Mem., Ex. 22 at 1-10 (Initial Administrative Complaint), later amending it several times, in part to attach to it the letters of warning, id., Ex. 22 at 11-30 (First Amended Administrative Complaint and Second Amended Administrative Complaint).  In addition, she incorporated a reference to an alleged racial slur that purportedly occurred during a February staff meeting.  Id. at 18, 28.  On July 15, 1987, the plaintiff amended her administrative complaint for a third time to include the letter of reprimand that she received, id. at 35 (Third Amended Administrative Complaint), and on August 17, 1987, the plaintiff filed her fourth and final amendments to her administrative

---

[14]	While this task appears simple at the onset, one of the primary difficulties the Court has had is determining upon which acts the plaintiff bases her retaliation claim.  Her complaint and its subsequent amendments are unhelpful.  On several occasions the Court has asked the plaintiff to clarify the acts upon which she is basing her theory of retaliation, given that almost all of her claims were dismissed based on her failure to challenge them at the administrative level, which thus has rendered irrelevant many of the factual allegations relied on by the plaintiff in her complaint.  However, rather than clarifying which events give rise to her remaining retaliation claim, the plaintiff has routinely reverted to reliance on the factual allegations of her complaint and its many supplements as a whole.  See, e.g., Pl.'s Mot. at 2. For example, the plaintiff continues to argue that her retaliation claim "[e]ncompassed [c]laims [one through five] of the [c]omplaint."  Pl.'s Reply at 3.  Thus, having no alternative, the

(continued . . . )

complaint, citing the defendant's selection of another African American female for a promotion for which the plaintiff had also sought acquire, id. at 32-34 (Fourth Amended Administrative Complaint).

The Department of Transportation's Internal Programs Division made several requests to meet with the plaintiff to initiate its investigation, and the plaintiff finally met with Ralph Ferguson, the Chief of the Internal Programs Division, on September 30, 1987. Id., Ex. 25 (Sept. 28, 1987 Telephone Record of Ralph Ferguson; Sept. 30, 1987 Visit Record of Ralph Ferguson). During the conversation, Mr. Ferguson requested that the plaintiff "be more specific, clarify the issues and not state them in general terms . . . [in order to determine upon] which of the allegations she might have a strong case." Id. Mr. Ferguson also informed the plaintiff that he would assign an investigator to her case, and that the plaintiff was required "to cooperate with the new investigator." Id. The record contains no evidence that the plaintiff had any further contact with Mr. Ferguson or the assigned investigator. Id. (January 13 and January 19, 1988 Supplements). Instead, she initiated this action.

Given the plaintiff's failure to meaningfully pursue her administrative remedies after August 1987, at minimum the Court finds that the plaintiff has failed to exhaust her administrative remedies with respect to any allegations occurring after that time. See Romero-Ostolaza, 370 F. Supp. 2d at 149 ("Given [the caselaw's] emphasis on strict adherence to procedure and on the severability of discrete acts . . . it makes sense to . . . bar subsequent discrete acts [if] a plaintiff fails to exhaust in the administrative process."); see also Velikonja v. Mueller, 315 F. Supp. 2d 66, 74 (D.D.C. 2004) (noting that requiring a plaintiff to exhaust each

_____

(. . . continued)
Court has attempted on its own to determine upon which actions the plaintiff could conceivably now assert her claim of retaliation.

discrete claim of discrimination or retaliation "comports with the purpose of the exhaustion doctrine to give the agency notice of a claim and [the] opportunity to handle it internally and ensures that only claims plaintiff has diligently pursued will survive.") (internal quotation marks omitted); Coleman-Adebayo, 326 F. Supp. 2d at 138 (dismissing claims for retaliation where the plaintiff failed to exhaust her administrative remedies with regard to discrete acts in her retaliation claim). The allegations which are barred by her failure to exhaust administrative remedies include the plaintiff's retaliation claim regarding her suspensions, the restriction placed on her ability to take leave, and her ultimate removal from federal service.

    2.    **Additional Theories of Retaliation**

    With regards to her pre-August 1987 allegations, the plaintiff generally argues that "[Mr.] Butterworth['s] actions of . . . warnings and other adverse actions were pretextual" and were retaliation taking place "after the plaintiff initiated communication [with the EEO counselor in December 1986] and after the plaintiff filed a formal complaint of racial discrimination in March 1987." Pl.'s Mot. at 27. To the contrary, the defendant argues that the "two letters of warning, the letter of reprimand, a fully successful mid-year review, the placement on leave restriction, the alleged 'racial remark,' work assignments and the staff listing" are not materially adverse personnel actions, and therefore the plaintiff cannot establish a claim for unlawful retaliation as to any of these acts. Def.'s Mem. at 26, 30. For the foregoing reasons, the Court finds that the defendant has the prevailing position.

    Title VII provides that it is "an unlawful employment practice for an employer to discriminate against . . . [an employee] . . . because [the employee] has made a charge . . . or participated in . . .[a] proceeding . . under this subchapter." 42 U.S.C. § 2000e-3(a) (2006). In deciding a claim for retaliation, the Court must employ the McDonnell Douglas burden-shifting

test.  Lewis v. District of Columbia, 653 F. Supp. 2d 64, 76-77 (D.D.C. 2009).  Under that

framework, the plaintiff must first establish a prima facie case of retaliation by showing that (1)

he engaged in a statutorily protected activity, (2) a reasonable employee would have found the

challenged action materially adverse, and (3) there existed a causal connection between the

protected activity and the materially adverse action.  Burlington N. & Santa Fe Ry. Co. v. White,

548 U.S. 53, 67-69 (2006).  In other words, "[t]o prove retaliation, the plaintiff generally must

establish that . . . she suffered (i) a materially adverse action (ii) because . . . she . . . brought . . .

a discrimination claim."  Baloch v. Kempthorne, 550 F.3d 1191, 1198 (D.C. Cir. 2009).  Once

these elements are satisfied, the burden then shifts back to the defendant to produce a legitimate,

non-discriminatory reason for its employment action.  Lewis, 653 F. Supp. 2d at 77, see Brady v.

Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (noting that "once the

employer asserts a legitimate, non-discriminatory reason [for the challenged action], the question

whether the employee actually made out a prima facie case is 'no longer relevant' " and

instructing district courts at that point not to analyze whether the plaintiff has made out a prima

facie case); see Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (extending Brady to

claims of retaliation).  And, once the defendant proffers a legitimate, non-discriminatory

rationale for its decision, the plaintiff must then show that the reason proffered by the defendant

is a pretext for impermissible discrimination.  Lewis, 653 F. Supp. 2d at 77.

Essentially, once the defendant proffers a legitimate, non-discriminatory rationale for its

decision, "the only question is whether the employee's evidence creates a material dispute on the

ultimate issue of retaliation 'either directly by [showing] that a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence.'"  Jones, 557 F.3d at 678 (quoting U.S. Postal Serv. Bd. of Governors v.

Aikens, 460 U.S. 711, 716 (1983)).  Thus, the Circuit has instructed that these "three relevant

categories of evidence—prima facie, pretext, and any other— [be considered] to determine

whether they either separately or in combination provide sufficient evidence for a reasonable

jury to infer retaliation."  Jones, 557 F.3d at 679 (internal quotation marks omitted).

### i.  First Letter of Warning

The plaintiff makes no specific legal arguments regarding the first letter of warning in her

submissions to the Court concerning the cross-motions currently before the Court.  On the other

hand, the defendant addresses both letters of warning and argues that the plaintiff cannot

demonstrate that she suffered a materially adverse personnel action as a result of the issuances of

letters of warning.  Def.'s Mem. at 27.  As to the first letter of warning, little needs to be said.

Given that this first letter of warning, dated December 16, 1986, was filed two days before the

plaintiff made her initial contact with an EEO counselor,[15] Def.'s Oct. 14, 2003 Mem., Ex. 21

(EEO Counselor's Report), and the plaintiff does not appear to allege participation in any other

earlier protected activity that resulted in retaliatory action being taken against her, no "inference

of retaliation" can lie based on the issuance of this letter.  See Hervey v. County of Koochiching,

527 F.3d 711, 723 (8th Cir. 2008) ("Evidence that the employer had been concerned about a

problem before the employee engaged in the protected activity undercuts the significance of the

temporal proximity."); Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1174 (10th

---

[15]    The plaintiff alleges that she previously met with a special assistant to the Director of Civil Rights for the
Office of the Secretary of Transportation sometime in 1983.  Pl.'s Mot. at 9.  During that meeting she spoke about
"the disparate treatment" she felt that she was experiencing, as well as her "use of leave shortly after her mother
died, the delay in [her] promotion to GM-14," her "lack of international travel," and other matters.  Id. at 9, 25.  This
meeting does not appear to have any significance to her claim for retaliation, as nowhere in the record is there
evidence that any person who she contends retaliated against her was made aware that she expressed any grievances
during that 1983 meeting, nor was any formal complaint ever filed encompassing the topics covered in the meeting
until the plaintiff met with an EEO counselor in December 1986.  Pl.'s Mot. at 16.  Further, the time elapse between
the acts complained of in this action, which allegedly occurred beginning in 1986, and the 1983 meeting is too
remote to reasonably support a nexus between the events.

Cir. 2006) (same); <u>Durkin v. City of Chicago</u>, 341 F.3d 606, 614-15 (7th Cir. 2003) ("It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity.").

### ii.    Second Letter of Warning

Similarly, the plaintiff makes no specific legal arguments regarding the second letter of warning in her submissions to the Court regarding the cross-motions under consideration, and the defendant maintains that the letter of warning is not a materially adverse personnel action because it "did not change [the] plaintiff's pay, grade, or materially affect her working conditions or cause material harm."  Def.'s Mem. at 26-27.  The defendant is correct.  The second letter of warning merely states that the plaintiff was given two assignments that she did not complete, and that she also failed to attend a staff meeting.  Def.'s Oct. 14, 2003 Mem., Ex. 2 (Second Letter of Warning).  The letter implemented no punishment against the plaintiff and merely informed her that "further misconduct or refusal to perform assignments could result in more severe disciplinary action."  <u>Id.</u> at 4.  Simply issuing a letter of warning that contains "no abusive language, but rather job-related constructive criticism, which 'can prompt an employee to improve her performance,'" is not a materially adverse action for the purposes of establishing a retaliation claim.  <u>Baloch</u>, 550 F.3d at 1199 (quoting <u>Whittaker v. N. Ill. Univ.</u>, 424 F.3d 640, 648 (7th Cir. 2005) (citation omitted)).

### iii.    Letter of Reprimand

Once again, the plaintiff makes no specific legal arguments regarding the letter of reprimand in her submissions to the Court regarding the parties' cross-motions.  And again, the defendant argues, as with the letters of warning, that the letter of reprimand is not a materially adverse personnel action because it "did not change [the] plaintiff's pay, grade, or materially

affect her working conditions or cause material harm." Def.'s Mem. at 26-27. The Court agrees that the plaintiff cannot established a retaliation claim based on the defendant's issuance of the letter of remand either. The letter of remand was written because despite the earlier issuance of the two letters of warning the plaintiff had continued "refusing to perform [her] assigned duties and to attend staff meetings." Def.'s Oct. 14, 2003 Mem., Ex. 3 (Letter of Reprimand) at 1-3. The letter went on to state that Mr. Butterworth knew that the plaintiff was "certainly capable of completing assigned duties" and that he "hope[d]" the letter would "convince [the plaintiff] to conduct [herself] in a more professional manner in the future. Id. at 3. The letter further advised the plaintiff that "[a] copy of [the] reprimand [would] be filed in [her] official personnel folder for a period of one to three years, and may be removed after one year, at [Mr. Butterworth's] discretion." Id. The conclusion noted above by the Baloch court concerning the letter of counseling equally applies to the letter of reprimand issued here, as that language also encompassed the letter of reprimand issued in Baloch. See 550 F. 3d at 1199.

In any event, even assuming that the letter of reprimand could be considered a materially adverse personnel action based on its negative content and inclusion in the plaintiff's personnel file for up to three years at the discretion of her supervisor, the plaintiff relies upon nothing more than mere legal conclusions to assert that the reasons stated in the letter for its inclusion in her personnel file were pretextual for the defendant's true retaliatory motive. Pl.'s Mot. at 18, 27, 33; see Beckford v. Geithner, 661 F. Supp. 2d 17, 29 (D.D.C. 2009) ("[W]here there is a reasonable explanation for the defendant's actions, more than 'mere proximity' is required to show that such an explanation is not genuine."). To start with, the plaintiff admits that she did not attend any of the staff meetings referenced in the letter of reprimand and the letters of warning. Def.'s Oct. 14, 2003 Mem., Ex. 15 at 9 (Transcript of Status Call Before Judge Penn dated January 11, 1988)

(indicating that during a status hearing before Judge Penn on January 11, 1988, the plaintiff stated "[t]he staff meeting serves no real purpose"); id. at 11 (in response to a question by Judge Penn as to whether she attended the staff meetings the plaintiff responded "No, Your Honor, I did not attend those meetings;" and when asked if she had been "asked to attend those meetings," the plaintiff responded "Yes, I was asked to attend.").  And in regards to the plaintiff's alleged continual refusal to complete work assignments as requested, id., Ex. 3 (Letter of Reprimand); id., Ex. 3 (Attachment Entitled "Economist GM-0110-14 – Major Duties), she has offered no evidence even suggesting that these allegations are either false or otherwise pretextual. Therefore, the Court must conclude that even if the plaintiff sufficiently alleged a prima facie case of retaliation (which she has not), the defendant has offered legitimate and non-discriminatory explanations for the issuance of the letter of reprimand, and on her ultimate burden to demonstrate retaliation she could not succeed in convincing a reasonable jury to infer that the letter of reprimand was actually a pretext for retaliation.  To the contrary, the overall record shows that there were clearly proper reasons for the plaintiff's employer to reprimand her, as compared to having written the letters for the purpose of deterring her from complaining about unlawful discrimination.

### iv.  The Plaintiff's Non-Promotion

The plaintiff contends that she was retaliated against when another employee was selected for a promotion on August 7, 1987, for which the plaintiff also applied, despite the fact that the "position . . . was clearly of a legal nature" and the plaintiff held a law degree while the promoted employee did not.  Pl.'s Mot. at 17.  The defendant asserts that its decision to promote another employee in lieu of the plaintiff was not done in retaliation against the plaintiff; rather, the promoted employee had "ten years of progressively responsible experience in international

trade policy and analysis and [overall] superior performance," whereas the plaintiff "had received letters of warning for failure to complete assignments and attend mandatory staff meetings." Def.'s Mem. at 30-31 (quotation marks omitted).

The law does not dictate which candidate an employer should choose when making a promotion decision. Indeed, an "employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256-259 (1981). The only question then is whether the defendant retaliated against the plaintiff when she was selected for the promotion. Jones, 557 F.3d at 678. Such an inference is warranted where the employer rests its decision on the candidates' relative job performance as a basis for its employment decision, and the plaintiff demonstrates that the difference between her qualifications and those of the promoted candidate were "great enough to be inherently indicative of [retaliatory] discrimination." Holcomb, 433 F.3d at 897 (citing Lathram v. Snow, 336 F.3d 1085, 1091 (D.C. Cir. 2003)); cf. Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1295 (D.C. Cir. 1998) (finding that a reasonable factfinder could infer discrimination where "the balance of qualifications weighed markedly in [the plaintiff's] favor, and that there was other evidence calling [the employer's] explanation into question"). Moreover, in order to survive a motion for summary judgment, "[a] plaintiff attacking a qualifications-based explanation" may also raise an inference of retaliation by "seek[ing] to expose other flaws in the employer's explanation," including, inter alia, "show[ing] that the employer's explanation misstates the candidates' qualifications." Aka, 156 F.3d at 1294-95.

The problem with the plaintiff's case is that based on the record the Court has before it she has not raised a reasonable inference that the defendant's reasons for not selecting her were false, nor has she proffered any evidence suggesting that her supervisors expressed any

"discriminatory statements or attitudes" concerning her participation in the protected activity as she suggests. <u>Montgomery v. Chao</u>, 546 F.3d 703, 708 (D.C. Cir. 2008) (indicating that among the ways to evidence retaliatory behavior a plaintiff could show (1) "the employer's proffered explanation for its actions is untrue" or (2) the employer otherwise exhibited a discriminatory attitude, made discriminatory statements or engaged in similar improper behavior); <u>see</u> Pl.'s Mot. at 23, 25-26, n.14. Even if the plaintiff could show that Mr. Butterworth made a remark that was racial in nature in February 1987 as she opines, and that the remark caused her more than "trivial" harm or was more than an "petty slight" from which the Court could infer racial animus (showings that she has failed to make), <u>Burlington N. & Santa Fe Ry. Co.</u>, 548 U.S. at 69, she has not shown that it was Mr. Butterworth who was the ultimate decision-maker who made the selection (indeed, the defendant contends it was Mr. Levine who did so, Def.'s Mem. at 30) or that the person selected was less qualified than she was. Moreover, the selectee was also an African-American female, Pl.'s Mot. At 17, 28; Def.'s Mem., Ex. 28 (Declaration of Eugenia J. Amado) at Attach. A (indicating the race of employees with the Office of International Transportation and Trade), which weighs significantly against a finding that the plaintiff's non-promotion was racially motivated. <u>Murray v. Gilmore</u>, 406 F.3d 708, 715 (D.C. Cir. 2005) (affirming the dismissal of a race discrimination claim because even assuming the defendant's justifications were pretext, "a replacement within the same protected class cuts strongly against any inference of discrimination") (citation omitted). Also, the plaintiff has presented no evidence that the defendant's representation that the selected candidates' qualifications were comparable to those of the plaintiff, or that the selectee misrepresented her qualifications. The plaintiff's argument is essentially that she had a law degree and the selectee did not. Pl.'s Mot. at 17. On the other hand, the defendant states that having a law degree was not determinative, and

the plaintiff's job performance was far less than stellar.  Def.'s Mem. at 30-31.  While the evidence concerning the qualification of the plaintiff and the selectee did not present a close case, even "'[i]n a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call.'"  Holcomb, 433 F.3d at 897 (quoting Aka, 156 F.3d at 1294).

The plaintiff's position that discrimination motivated the issuance of her letters of reprimand, and thus those letters cannot serve as an adequate basis for the defendant's decision not to promote her, Pl.'s Mot. at 27; id. at Ex. 7 (Memorandum from Connie Reshard to Bruce Butterworth); see also Def.'s Mem., Ex. 21 (EEO Counselor's Report), is tenuous at best, and again rests only on her own speculation without any support in the record.  The plaintiff admitted that she did not attend staff meetings, and nothing in the record suggests that she completed the tasks she was assigned within the timeframes assigned her by her supervisors, or that she ever completed those assignments.  Moreover, the plaintiff has not established that a law degree was necessary to perform the job of an economist, which if that were the case might demonstrate that she was more qualified for the promotion than was the individual ultimately selected for the position.  In the end, when faced with judging the defendant's personnel decision from this contextual backdrop, given the legitimate reason proffered by the defendant for the plaintiff's non-selection and her inability to refute it, the Court must give the defendant, as the employer, the benefit of any doubt.  Holcomb, 433 F.3d at 897 (citation omitted).  The plaintiff has simply not put forth a basis for her position, besides her own mere speculation, that retaliatory animus was the reason for her non-selection, and she is not entitled to a judgment in her favor on that basis alone.  See Hawkins v. PepsiCo, Inc., 203 F.3d 274, 281 n.1 (4th Cir. 2000) (finding that

the plaintiff could not maintain her retaliation claim where she "relie[d] on mere speculation in asserting that her prior racial complaints were the real reason for [the adverse employment action]."); Filippo v. N. Ind. Pub. Serv. Corp., Inc., 141 F.3d 744, 750 (7th Cir. 1998) (employee's speculation that union retaliated against her for running for local union president deemed insufficient to create genuine issue of material fact to defeat summary judgment motion); cf. Mills v. First Fed. Sav. & Loan Ass'n of Belvidere, 83 F.3d 833, 841-42 (7th Cir. 1996) (employee's subjective belief that she was terminated due to her age could not defeat summary judgment motion of employer who had concrete record of employee's poor work performance).  And, "[s]ince the ultimate burden of persuasion in proving retaliation remains with the plaintiff, summary judgment is appropriate when the employee is unable to satisfy this burden."  Samii v. Billington, 195 F.3d 1, 3 (D.C. Cir. 1999) (citations omitted); accord Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, (2000).  Accordingly, the Court is unable to disregard the legitimate non-retaliatory reason provided by the defendant for not promoting the plaintiff as actually a pretext for retaliation, and therefore her retaliation claim based on her non-promotion cannot survive the defendant's summary judgment motion.

### v.      Mid-Year Evaluation

The plaintiff complains that while she received excellent evaluations, she was criticized for refusing to complete some assignments.  Pl.'s Mot. at 9.  Also, the plaintiff complains that her evaluations were not maintained in her personnel file, and that she did not receive a mid-year performance evaluation in 1985.  Id. at 10, 12-13.  The defendant maintains that the plaintiff's "fully successful mid-year review" and work assignments "clearly did not change [the] plaintiff's pay, grade, or materially affect her working conditions or cause material harm," and that the "[p]laintiff's subjective perceptions of harm, humiliation, or loss of reputation simply do not rise

to the level of a materially adverse action." Def.'s Mem. at 26-27. The defendant's position is correct.

The plaintiff has not demonstrated through objective evidence that any of her performance evaluations, or the absence of such evaluations she should have received, resulted in a materially adverse action against her. First, an employer is entitled to criticize an employee's "negative behaviors" without the criticism rising to the level of a materially adverse action. Taylor v. Solis, 571 F.3d 1313, 1321 (D.C. Cir. 2009); Rattigan v. Holder, 604 F. Supp. 2d 33, 47 (D.D.C. 2009) ("[C]riticizing [an employee] by written memoranda . . . amounts to the kind of 'petty slights or minor annoyances that often take place at work and that all employees experience' and that, consequently, fall outside the scope of the anti-discrimination laws.") (citation omitted). Therefore, to the extent that the plaintiff was criticized for her performance, it was within the defendant's authority to convey that criticism in the matter that he did. Further, a performance evaluation will not amount to a materially adverse action where the plaintiff suffers no "tangible job consequences." Taylor, 571 F.3d at 1321 (internal quotations omitted). "In order for a performance evaluation to be materially adverse, it must affect the employee's 'position, grade level, salary, or promotion opportunities.'" Id. (finding that even where the plaintiff's performance evaluation was lowered from "outstanding" to "excellent," the plaintiff could not rest a Title VII claim on a "conclusory allegation" that detrimental employment action resulted (citing Baloch, 550 F.3d at 1199)); see also Gelin v. Paulson, No. 05-6043-cv, 234 Fed. App'x. 5, 2007 WL 1366325 at *7 (2d Cir. May 10, 2007) (finding that an objectively positive performance evaluation was not an adverse employment action because Title VII's "provisions…for judging harm must be objective," and a plaintiff's "subjective belief that he was 'downgraded' is irrelevant.") (citations omitted). Moreover, the actual evaluation about which

the plaintiff complains rated her performance as fully successful. Pl.'s Mot. at 13; id., Ex. 5. On this record, the plaintiff has utterly failed to explain why the challenged evaluation should be considered materially adverse. Nor can the Court find that any material adversity resulted from the plaintiff not receiving the performance evaluations she contends she was entitled to receive. In sum, the plaintiff's performance evaluation allegations fail to support a claim for retaliation.

### vi.    The Plaintiff's Remaining Allegations

The plaintiffs' remaining theories of retaliation are based on a racial remark allegedly made by Mr. Butterworth during a staff meeting, the listing of her name in the staff directory below persons of lesser rank, and her work assignment allocation are so lacking in evidentiary support as to require little of the Court's attention. Apart from the plaintiff's bare speculation that Mr. Butterworth's comment was racially motivated when he compared her to a white co-worker (who was also one of the defendant's economists, but had a lower pay grade than the plaintiff) during a staff meeting, or that her work assignments or listing at the bottom of the staff directory were racially motivated, see Def.'s Oct. 14, 2003 Mem., Ex. 4 (Response Memorandum) at 2, these conjectural allegations could hardly serve as the basis for an actionable retaliation claim. First, there is no evidence upon which the Court could find that Mr. Butterworth's comparison of the plaintiff to a white co-worker had racial implications. See Hester v. BIC Corp., 225 F.3d 178, 185 (2d Cir. 2000); cf. Alexis v. McDonald's Rests. Of Mass., Inc., 67 F.3d 341, 347 (1st Cir. 1995), cited in Hester, 225 F.3d at 185 (observing that "[a]lthough [the defendant's conduct] . . . may be entirely compatible with a race-based animus [by the causal observer], there [must be] . . . foundation for an inference that [the defendant] harbored a racial animus toward [the plaintiff] or anyone else" (some alterations added)). The same is the case with respect to the location of the plaintiff's name in the staff directory and her work assignments. There is simply

no evidence from which an inference of racial animus can be drawn from these actions, much less that the actions were taken in response to the plaintiff's exercise of her legal rights or to deter her from complaining about discriminatory treatment. And even if the Court could infer that Mr. Butterworth's comment and the plaintiff's listing in the staff directory were racially motivated, these events would qualify as nothing more than "trivial" harms and "petty slight[s]," which would not support a claim of retaliation. Burlington N. & Santa Fe Ry. Co., 548 U.S. at 69. Moreover, as to her work assignment allegation, the plaintiff has offered no evidence from which a reasonable jury could infer that her work assignments were any different from comparable employees of different races or genders. Even when considered collectively, the nature of the statement, the staff directory listing and her work assignments, in the absence of any other evidence from which racial animus toward the plaintiff can be inferred, leads the Court to conclude that the plaintiff's retaliation claim cannot survive the defendant's summary judgment motion.

## III. CONCLUSION

For the foregoing reasons the Court must grant the defendant's motion to stay discovery and its motion for summary judgment, and deny the plaintiff's cross-motion for summary judgment.[16]

_____/s/_____
REGGIE B. WALTON
United States District Judge

---

[16]     An Order consistent with the Court's ruling accompanies this Memorandum Opinion.